**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| TAVARES MONTGOMERY,<br><br>Plaintiff,<br><br>vs.<br><br>MARCUS HARRINGTON, *et al.*,<br><br>Defendants. | No. C23-2009-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## *I. INTRODUCTION*

This case is before me on a motion (Doc. 65) for summary judgment filed by defendants Marcus Harrington, Admir Babic and TJ Frein. Plaintiff Tavares Montgomery has filed a resistance (Doc. 76) and the defendants have replied (Doc. 77). Oral argument is not necessary. *See* LR 7(c).

## *II. PROCEDURAL HISTORY*

In his pro se 42 U.S.C. § 1983 complaint (Doc. 1-1), Montgomery sued the City of Waterloo, Iowa, the Waterloo Police Department and three Waterloo Police Department officers: Officer Marcus Harrington, Officer Admir Babic and Sergeant TJ Frein. *Id.* at 2-3. He alleged that the defendants used excessive force against him and were deliberately indifferent to his medical needs, in both their individual and official capacities. *Id.* at 2-5. On initial review, I dismissed Montgomery's claims against the City of Waterloo and the Waterloo Police Department, along with his official capacity claims against Harrington, Babic and Frein. Doc. 6 at 8. I allowed his excessive force claims against the officers in their individual capacities to proceed. *Id.*

Montgomery then filed a motion for leave to file an amended complaint (Doc. 8). I granted his motion and have chosen to treat a combination of the initial complaint (Doc.

7) and the amended complaint (Doc. 8) as his amended complaint. Doc. 16 at 2. In the amended complaint, Montgomery alleges that the officers used excessive force against him by:

- Punching him
- Applying pepper spray (OC spray)
- Using a segmenting technique on him
- Hogtieing him
- Jumping and sitting on his back
- Twisting and mounting his body
- Using a taser and "police force"

Doc. 7 at 4-5; Doc. 8 at 1-2. Because Montgomery now admits that the officers did not hogtie him, I will not discuss that allegation further. Doc. 76-2 at 5 ¶ 25. Although I did not specifically allow Montgomery's deliberate indifference to medical needs claim to proceed, I will address it because the parties have briefed the issue. Trial is scheduled to begin November 16, 2026.

## *III. APPLICABLE STANDARDS*

### *A. Motion for Summary Judgment*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical"

under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light

most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

### ***B. Section 1983 Claims***

Montgomery brings his claims under 42 U.S.C. § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, 42 U.S.C. § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Conner*, 490 U.S. 386, 393-94 (1989); *Chapman v. Hou. Welfare Rts. Org.*, 441 U.S. 600, 617 (1979). "One cannot go into court and claim a 'violation of [42 U.S.C.] § 1983' — for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 ("Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) ("Constitution and laws" means 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statute, as well as those created by

the Constitution.). To state a claim under § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States and (2) the alleged deprivation of that right was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

### *C. Qualified Immunity Standards*

Qualified immunity shields a government official from individual liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004). "The Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Davis*, 375 F.3d at 711-12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (citing *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). To determine whether a defendant is entitled to qualified immunity, courts ask (1) whether the facts alleged or shown establish a violation of a constitutional or statutory right, and (2) whether that constitutional right was clearly established as of the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Unless the answer to both questions is yes, a defendant is entitled to qualified immunity. *See Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 791 (8th Cir. 2013).

"For a right to be 'clearly established,' the law must have been sufficiently clear, at the time of the official's conduct, to put every reasonable official on notice that what he was doing violated that right." *Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Stated another way, its "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations omitted). "A plaintiff need not cite a case directly on point, but controlling

authority or a robust consensus of cases of persuasive authority must have put the statutory or constitutional question beyond debate as of the date of the alleged violation." *Hamner*, 937 F.3d at 1177 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (internal quotations omitted)).

## *IV. RELEVANT FACTS*

Unless otherwise noted, the following facts are undisputed for purposes of the defendants' motion:

This case arises from Montgomery's arrest by Waterloo Police officers on November 2, 2022. *See* Doc. 65-1 at 1 ¶ 1. While patrolling, Officer Marcus Harrington spotted Montgomery, recognized him and knew that he had pending warrants. *Id.* ¶¶ 2-3. Other officers had told Harrington that Montgomery had threatened "to disarm and kill officers the next time he had contact with them." *Id.* ¶ 4. Harrington asked to speak with him, but Montgomery refused and walked away. *Id.* at 2 ¶ 5. Harrington repeatedly told him to stop and show his hands, but he continued to walk away. *Id.* ¶¶ 6-8.

Harrington drew his taser and ordered Montgomery to stop. *Id.* ¶ 9. Montgomery turned and looked at Harrington several times but continued walking away. *Id.* ¶¶ 9, 12. Sergeant TJ Frein arrived and again told him to stop, at which point Montgomery ran away. *Id.* ¶¶ 13-14. Harrington told Montgomery that he would tase him if he did not get on the ground. *Id.* at 3 ¶ 16. Montgomery did not get on the ground and the officers believed he intended to fight them. *Id.* ¶ 17. Frein attempted to tackle him before Harrington brought him to the ground. *Id.* ¶ 18. While Montgomery lay on his back with Harrington on top of him, the officers ordered him to put his hands behind his back. Doc. 67-2 at 4 ¶ 19; Doc. 65-3 Ex. A at 1:25-2:35. He did not comply and resisted as officers struggled to handcuff him.[1] Doc. 65-1 at 3 ¶ 20; Ex. A at 1:25-2:35. Officers

[1] Montgomery contends that once officers brought him to the ground, he was compliant and did not resist arrest. Doc. 76-2 at 4-5 ¶¶ 20. While courts view the facts in the light most favorable to the nonmoving party, they need not adopt factual allegations blatantly contradicted by video

threatened to tase Montgomery if he did not comply. Doc. 65-1 at 3 ¶ 21. Harrington sprayed him in the face with pepper spray. *Id.* ¶ 22. Harrington used a segmenting technique, pressing Montgomery's head into the concrete, to prevent him from further resisting arrest. *Id.* ¶ 23; Ex. A at 2:00-2:35. Once the officers finally cuffed his hands behind his back, Harrington released the pressure from his head and officers stopped using force. Doc. 65-1 at 4 ¶ 26; Ex. A at 2:20-3:35.

After cuffing Montgomery, the officers searched him incident to arrest. *Id.* ¶ 27. As they rolled him to the side to search his front pockets (*id.* ¶ 27), he complained of severe pain in his back.[2] Doc. 76-2 at 5 ¶ 27. The officers continued the search. *Id.* Montgomery yelled in pain and told the officers he had undergone back surgery. *Id.* at 6 ¶ 28. The officers did not know about his preexisting back condition before arresting him. *Id.* ¶ 31.

After the search revealed crack cocaine and a pipe, the officers rolled Montgomery again. *Id.* ¶¶ 32-33. He again expressed pain and declined to change positions. *Id.* ¶ 33. Montgomery requested an ambulance four minutes after the officers arrested him. *Id.* at 5 ¶ 34. An officer requested that dispatch send an ambulance. *Id.* at ¶ 35. Montgomery stated that he could not feel his legs, that officers had broken his fusion and that he could not sit or stand up. *Id.* at ¶¶ 36-38. While they waited for the ambulance, he threatened the officers, stating that he would fight them if he could move and would kill Harrington. *Id.* ¶ 39-40.

---

evidence. *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017). Harrington's bodycam video clearly shows officers struggling to handcuff Montgomery as he disobeyed commands. Ex. A at 1:25-2:35.

[2] Montgomery alleges that he told the officers about his back surgery as soon as Harrington brought him to the ground, before officers applied pepper spray or the segmenting technique. Doc. 76-2 at 6-7 ¶¶ 28–29, 31, 33. This is again contradicted by Harrington's bodycam. *See* Ex. A at 1:25-4:30 (showing Montgomery mentioning his back only after the search began).

The ambulance arrived within ten minutes after the officers requested it. *Id.* ¶ 41. After evaluating Montgomery, paramedics transported him to the hospital. *Id.* ¶ 42-43. At the hospital, staff flushed the pepper spray from his eyes. *Id.* ¶ 44. He received medical imaging, which came back normal, showing no spinal fracture, soft tissue damage or damage to his fusion. *Id.* ¶ 45. Instead, the examination showed only scrapes and cuts to his head. *Id.* at 6 ¶ 46. Despite his November 2, 2022, medical examination, Montgomery alleges that he has suffered continued back pain, leading to two surgeries and physical limitations.[3] Doc. 76-2 at 7-8 ¶¶ 45-46.

## *V. DISCUSSION*

The defendants seek summary judgment on both the excessive force and deliberate indifference claims. I will address these claims and arguments in turn.

### *A. Montgomery's Claims*

#### *1. Excessive Force*

Montgomery alleges that officers used various forms of excessive force during his arrest including:

- Punching him
- Applying pepper spray
- Using a segmenting technique on him
- Jumping and sitting on his back
- Twisting and mounting his body

[3] Montgomery contends that a doctor told him that the only way that he could have broken the titanium plate in his back "would have been through extensive force like that used in the incident." Doc. 76-2 at 7-8 ¶ 45. Although Montgomery includes this statement in his affidavit, he has not offered admissible evidence to support this hearsay statement. *See Cronquist v. City of Minneapolis*, 237 F.3d 920, 927 (8th Cir. 2001) ("[A]ffidavits based on hearsay cannot defeat a motion for summary judgment.")

- Using a taser and "police force"

Doc. 7 at 4-5; Doc. 8 at 1-2. Montgomery argues that a reasonable jury could find that the officers used unreasonable force "under the totality of the circumstances and that clearly established law prohibited the degree and type of force employed." Doc. 76-1 at 6. The defendants argue that they acted reasonably while arresting Montgomery because "[h]e had a warrant out for his arrest, was immediately noncompliant, fled from the Officers, and resisted arrest even after he was brought to the ground." Doc. 65-2 at 6-7. They contend their force, "which peaked at pepper spray, was reasonable under those circumstances." *Id.* at 7. They argue that even if their actions were unreasonable, Montgomery's rights to be free from this particular use of force was not clearly established. *Id.*

The standard to apply in excessive force cases is well-settled:

> The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. [*Graham v. Connor*, 490 U.S. 386, 397 (1989)]. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest. *Id.* at 396.

*Malone v. Hinman*, 847 F.3d 949, 952 (8th Cir. 2017) (citation omitted). "This calculus allows for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citation omitted).

This reasonableness standard "is viewed from the vantage point of the police officer at the time of arrest or seizure." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citation omitted); *see also Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002) ("The aforementioned reasonableness of force is judged from the perspective of the officer on the scene, taking into consideration the facts known to him,

as opposed to one possessing the illuminating power of hindsight." (citation omitted)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). "Circumstances relevant to the reasonableness of the officers' conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Setchfield v. St. Charles Cnty.*, 109 F.4th 1084, 1092 (8th Cir. 2024) (quoting *Graham*, 490 U.S. at 396). The court may also "consider the result of the force," *Howard*, 570 F.3d at 989 (citation omitted), "the extent of the suspect's injuries" and "standard police procedures." *Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007) (citation omitted).

"[I]f a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him," including to effect an arrest. *See Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022); *see also Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) ("Force can only be used to overcome physical resistance or threatened force."). Although some force may be justified when an arrestee refuses commands or passively resists arrest (i.e., refusing to stand), the force must be proportionate to the situation. *Compare Rokusek v. Jansen*, 899 F.3d 544, 547-48 (8th Cir. 2018) (when suspect was unarmed and fully within officer's control, but refused order to stand up to be handcuffed, officer used "more than 'the force necessary' to handcuff" the suspect when he lifted him off of the ground and slammed his head into the floor), *with Carpenter v. Gage*, 686 F.3d at 649-50 (when plaintiff suspected of assaulting first responders "refused to offer his hands when ordered to do so, and . . . reached for the couch in an effort to lift himself from the floor . . . deputies on the scene reasonably could have interpreted [his] actions as resistance and responded with an

amount of force that was reasonable to effect the arrest."). However, the fact that a suspect may have briefly stopped resisting or briefly complied with arrest does not end the analysis. *See Nelson v. Cnty of Wright*, 162 F.3d 986, 991 (8th Cir. 1998) ("Nelson now tries to analyze the brief struggle as if the incident were composed of distinct and separate segments. At the time, however, it was uncertain what would happen next. The situation was tense and 'rapidly evolving.'" (citing *Graham*, 490 U.S. at 397)).

Accepting Montgomery's version of events as true (except as clearly contradicted by video evidence), the officers did not use unreasonable force by threatening to tase Montgomery, pepper spraying him, jumping and sitting on his back or using a segmenting technique. Although Montgomery claims otherwise, all these uses of force happened both before the officers had handcuffed him and before he told them about his back injury, and while Montgomery was struggling with them.

When Harrington saw Montgomery, he knew that Montgomery had warrants for his arrest and believed that Montgomery had threatened to disarm and kill law enforcement. Doc. 65-1 at ¶¶ 2-4. After Harrington ordered Montgomery to stop and threatened to use his taser if Montgomery did not do so, Montgomery refused and continued to walk away. *Id.* at 2 ¶¶ 9, 12. An officer can reasonably interpret walking away after an order to stop as noncompliance warranting the use of force. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017). While Montgomery states he refused to stop because he was afraid (Doc. 76-2 at 2 ¶ 10), his subjective intentions do not determine whether force was reasonable. *See Ehlers*, 846 F.3d at 1011 ("[A]n arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior."). Frein again ordered Montgomery to stop, but he refused and ran away. Doc. 65-1 at 2 ¶¶ 13-14. Harrington threatened that he would tase him if he did not get on the ground. *Id.* at 3 ¶ 16. Threatening to tase a fleeing suspect is not unreasonable. *See Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994) ("When an arrestee flees or resists, some use of force by the police is reasonable.");

*McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (determining that tasing a fleeing suspect accused of misdemeanor offenses was not unreasonable).

After the officers brought Montgomery to the ground, they ordered him to put his hands behind his back, but he did not. Doc. 76-2 at 4 ¶ 19; Ex. A at 1:25-2:30. As they struggled to handcuff him, they mounted him, sat on him, threatened to tase him, sprayed him with pepper spray and used a segmenting technique. Ex. A at 1:25-2:30. Once the officers handcuffed Montgomery, they stepped away and stopped using force. *Id.* at 2:30-3:30. From the officers' point of view, it was not unreasonable to confuse Montgomery's inability to place his arms behind his back – whether due to injury or resistance – with active, intentional resistance. As discussed above, his subjective motive for not providing his hands is not relevant, as I must observe his actions from the point of view of a reasonable officer. Particularly here, when the officers were faced with Montgomery's apparent resistance following a foot chase, it was not unreasonable to believe that he was still actively resisting arrest. *See Schoettle v. Jefferson Cnty*, 788 F.3d 855, 860-61 (8th Cir. 2015) (officer's use of force was reasonable although plaintiffs' belligerence was caused by a medical condition, and not by intentional resistance).

Montgomery's perceived resistance was sufficient to justify the officers placing their weight on him, threatening to tase him, spraying him with pepper spray and using a segmenting technique before handcuffing him. "Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing." *Carpenter*, 686 F.3d at 649 (citing *Mann*, 497 F.3d at 826). In *Carpenter*, the Eighth Circuit held that the defendant officers "reasonably could have interpreted Carpenter's actions as resistance" when the plaintiff "had his arms underneath him, just huddled up under his chest laying on top of them," and the plaintiff ignored orders and physical attempts by the officers to retrieve his hands for cuffing. 686 F.3d at 649-50. In *White v. Jackson*, 865 F.3d 1064 (8th Cir. 2017), the court considered whether law enforcement had used reasonable force against an arrestee when they "placed a knee on

his back when he was being handcuffed." *Id.* at 1080. The court concluded "that it was not an unreasonable use of force to push [the plaintiff] to the ground and place a knee on his back" because "[t]he right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Id.* (quoting Graham, 490 U.S. at 396). Any jumping, mounting, sitting or use of the segmenting technique that the officers performed was like the knee in *White* – reasonable force used to effect an arrest. The officers escalated their use of force only when less-forceful means were unsuccessful. Because the officers' use of force to effect the arrest was not unreasonable, it did not violate Montgomery's constitutional rights and is protected by qualified immunity.

As to the allegations that officers punched Montgomery or twisted his back to search him after he told the officers his back was injured, it is unclear from the bodycam footage whether the officers punched Montgomery. Ex. A at 1:25-2:30. If they did, it was while they were struggling to handcuff him. *Id.* It is well-established that officers may not gratuitously use force on a subdued and restrained arrestee. In *Gill*, the Eighth Circuit upheld an award of damages against an officer when "[t]he evidence show[ed that] Gill did not resist and complied with the officers' demands. While Gill was pinned to the ground by multiple officers, Maciejewski approached and smashed his knee into the hapless suspect's head." 546 F.3d at 562. Under those circumstances, the "knee-drop maneuver" constituted excessive force. *Id.* Similarly, in *Krout v. Goemmer*, 583 F.3d 557 (8th Cir. 2009), the Eighth Circuit held that kneeing the plaintiff five to six times in the back after he was "handcuffed, not resisting, and fully subdued" was a "gratuitous" use of force that could not be justified by the need to effect an arrest. *Id.* at 566.

Unlike the situations in *Gill* and *Krout*, officers had not restrained and subdued Montgomery when any punch occurred. He had not submitted to being handcuffed and, from the officers' perspective, was still actively resisting the handcuffs. Because any alleged punch was incidental to the struggle to handcuff Montgomery, not gratuitous

force officers used after they had subdued and handcuffed him, Montgomery has not shown his right to be free from such force was clearly established.

After Montgomery told the officers that he was in pain and had undergone back surgery, the only force that officers used was rolling him to perform a search incident to arrest. Ex. A at 3:25-8:00. At this point, Montgomery was handcuffed and no longer resisting. *Id.* Montgomery provides no cases or authorities clearly establishing that law enforcement cannot manipulate an arrestee to perform a search when the arrestee had fled, resisted arrest and officers believed had threatened to kill and disarm law enforcement. *See* Doc. 76-1 at 10-11. The defendants argue that they did not use excessive force by manipulating Montgomery's body to perform the search. Doc. 77 at 4-5 (citing *VanPelt v. City of Detroit*, 70 F.4th 338 (6th Cir. 2023)). Doc. 77 at 5. In *Van Pelt*, the plaintiff tried to flee while handcuffed and an officer tackled him. 70 F.4th at 339. The officer attempted to pull the plaintiff up and ordered him to stand, but he said he could not because his hip was broken. *Id.* The plaintiff continued to complain of pain in his hip and the officer flipped him to his other side. *Id.* As he continued to cry out in pain, he admitted he had drugs and the officer moved him to search him. *Id.* The plaintiff argued that the officer "yanked him around in 'a malicious manner plainly designed to inflict pain onto [his] already injured left hip.'" *Id.* at 341 (citation omitted). The court found video contradicted his account and held that the officer used reasonable force in moving him for the search. *Id.*

While the court in *VanPelt* ruled that an officer used reasonable force when moving the arrestee complaining of a broken hip and pain, the alleged injury here differs in scope. Montgomery claimed that he had undergone back surgery, could not stand up and could not feel his legs. Ex. A at 3:25-8:00. Rolling him to perform a search risked further aggravating his injury. However, considering the legitimate need to perform a search incident to arrest, I cannot find that Montgomery's right to not be rolled and manipulated was clearly established. As such, I find that the doctrine of qualified immunity requires the dismissal of all aspects of Montgomery's excessive force claim.

### 2. *Deliberate Indifference*

"The Fourteenth Amendment's Due Process Clause 'require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police.'" *Smith v. Kilgore*, 926 F.3d 479, 486 (8th Cir. 2019) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (alterations in original). Arrestees and pretrial detainees receive the same protections against deliberate indifference to medical needs under the Fourteenth Amendment as convicted prisoners receive under the Eighth Amendment. *Carpenter*, 686 F.3d at 650.

To demonstrate deliberate indifference to a medical need, a plaintiff must show "that (1) the [plaintiff] suffered from an objectively serious medical need, and (2) the [] official knew of the need yet deliberately disregarded it." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir.1997)). An official is deliberately indifferent "if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007). The official's knowledge must be two-fold; they must have recognized a substantial risk of harm and that their conduct was irresponsible considering the risk. *Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021) ("The subjective prong has two components: '[T]he evidence must show that the officers recognized that a substantial risk of harm existed and knew that their conduct was inappropriate in light of that risk.'") (quoting *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015)) (alteration in original). A plaintiff may prove the defendant's knowledge of the risk of harm through circumstantial evidence. *Letterman*, 789 F.3d at 862. For instance, a plaintiff may show the defendant "had been exposed to information concerning the risk and thus 'must have known' about it," or that because the risk was obvious the defendant knew his or her actions were inappropriate. *Letterman*, 789 F.3d at 862 (quoting *Farmer*, 511 U.S. at 842).

A plaintiff must then show a defendant deliberately disregarded the risk. *Selk*, 508 F.3d at 873. This standard is akin to criminal recklessness. *Shipp*, 9 F.4th at 703.

"Although the level of blameworthiness must rise above negligence, a plaintiff does not have to show that the [] officials acted 'for the very purpose of causing harm or with knowledge that harm w[ould] result.'" *Letterman,* 789 F.3d at 862 (quoting *Farmer*, 511 U.S. at 835). "[D]eliberate indifference requires a highly culpable state of mind approaching actual intent." *Choate v. Lickhard*, 7 F.3d 1370, 1374 (8th Cir. 1993). A claimant's "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000). If a defendant responded reasonably to a risk, he or she is not liable, even if the plaintiff ultimately suffered an injury. *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) (citing *Farmer*, 511 U.S. at 844).

The parties dispute both prongs of deliberate indifference. While it is doubtful that the officers were deliberately indifferent to an objectively serious medical need, I need not decide this issue because no existing precedent places the lawfulness of their actions beyond debate. Montgomery outlines the legal standards for deliberate indifference but cites no authority showing that law enforcement is deliberately indifferent to an arrestee's medical needs by performing a search while also requesting emergency medical services (EMS).[4] Doc. 76-1 at 11-12.

In *Stewart v. Garcia*, 139 F.4th 698 (8th Cir. 2025), the court considered the subjective prong of deliberate indifference in a case in which law enforcement called EMS but forcibly moved an arrestee who experienced pain and paralysis symptoms after being tased and falling eight to nine feet. *Id.* at 708-10. The arrestee, laying "face down

[4] Although Montgomery primarily focuses on his alleged back injury, he also contends that the officers were deliberately indifferent by "failing to treat the [pepper] spray effects promptly before further handling." Doc. 76-1 at 12. It is uncontested that hospital staff flushed his eyes. Doc. 65-1 at 5 ¶ 44. Thus, he argues a deliberate indifference claim based on delay of care. When a "deliberate-indifference claim is based on 'a delay in medical treatment,' we measure 'the objective seriousness of the deprivation . . . by reference to the *effect* of delay in treatment.'" *Cullor v. Baldwin*, 830 F.3d 830, 837 (8th Cir. 2016) (quoting *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (alterations in original). Montgomery has not argued the delay had any effect.

on the ground, did not move at all when [the officer] removed the taser prongs from his body." *Id.* The arrestee told the officer "that he could not stand up, was in pain, and could not feel his legs." *Id.* Rather than tending to the arrestee's medical needs, the officer told him "to 'quit acting' and to 'stand up.'" *Id.* The arrestee tried to stand up and failed, before officers dragged him to the patrol car. *Id.* When the officers dragged the arrestee, they "knew EMS was on its way, and neither articulated any exigency or other reason for moving [him] before the EMTs arrived." *Id.* Nor did the record show any. *Id.*

The court stated: "At no time during the encounter was [the arrestee] belligerent or combative; rather, he apologized several times for not being able to do what the officers were asking him to do. The body camera video never shows [him] moving his legs of his own volition." *Id.* at 708-09. The court found that a jury "could reasonably find that [the officer] was aware that [the arrestee] was seriously injured and possibly paralyzed based on the height of the fence [he] fell from, his apparent inability to move his legs, and his repeated and consistent cries of pain." *Id.* at 709. The court determined that "by choosing to physically move and manipulate [his] body for purposes unrelated to treatment or any other exigency, instead of waiting for EMS, a jury could find that [the officer] disregarded the risk that he would cause [him] unnecessary pain and exacerbate his evidently serious injuries." *Id.* The court ultimately held that the arrestee failed to show this right was clearly established because he did not identify case law holding, with the requisite level of specificity, that the officer's actions were unlawful. *Id.* at 710. The court noted that the officer had called EMS and that he "would not have been on notice that his conduct—after calling EMS and before the EMTs arrived—amounted to deliberate indifference." *Id.*

Like *Stewart*, this case concerns law enforcement moving an arrestee who complained of paralysis and pain. Even if the officers had acted with deliberate indifference when they moved Montgomery, I cannot find they would have been on notice that their actions were unlawful because this case differs from *Stewart*. First, unlike

*Stewart*, in which law enforcement moved the arrestee "for purposes unrelated to treatment or any other exigency," the defendants moved Montgomery to perform a search incident to arrest. Doc. 65-1 at 4 ¶ 27. When Harrington encountered Montgomery, Harrington believed he had threatened to disarm and kill law enforcement. *Id.* at 1 ¶ 4. Later in the encounter, he threatened to kill Harrington. *Id.* at 5 ¶ 40. Under these circumstances, the officers had good reason to perform a search incident to arrest.

Second, unlike the arrestee in *Stewart*, Montgomery was resistant and combative. He had actively resisted arrest until the officers handcuffed him. Ex. A at 1:25-2:35. Montgomery has not shown that this is "the rare 'obvious case,' where the unlawfulness of the [defendants'] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). The defendants are entitled to qualified immunity on Montgomery's deliberate indifference claim.

## *VI. CONCLUSION*

For the reasons set forth herein:

1. Defendants' motion (Doc. 65) for summary judgment is **granted** in its entirety. All claims asserted by plaintiff Tavares Montgomery are **dismissed with prejudice.**

2. Judgment **shall enter** against plaintiff Tavares Montgomery and in favor of the defendants.

3. The Clerk of Court shall **close this case.**

**IT IS SO ORDERED** this 14th day of August, 2026.

Leonard T. Strand
United States District Judge